IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| Bk. No. 14-00039 | ) | CIVIL 15-00233 LEK-BMK |
| (Chapter 13) | ) | |
| | ) | |
| In re: | ) | |
| | ) | |
| Alvin Woods, | ) | |
| | ) | |
|      Debtor, | ) | |
| _____ | ) | |
| ADV.NO 14-90019 | ) | |
| | ) | |
| VICTORIA SEBETICH, | ) | |
| | ) | |
|      Plaintiff/ | ) | |
|      Appellant, | ) | |
| | ) | |
|   vs. | ) | |
| | ) | |
| ALVIN K. WOODS, | ) | |
| | ) | |
|      Defendant/ | ) | |
|      Appellee. | ) | |
| _____ | ) | |

**ORDER AFFIRMING IN PART AND REVERSING AND REMANDING IN PART
THE BANKRUPTCY COURT'S FINDINGS OF FACT
AND CONCLUSIONS OF LAW AND THE JUDGMENT**

Before the Court is pro se Plaintiff/Appellant

Victoria Sebetich's ("Sebetich") appeal from the bankruptcy

court's Findings of Fact and Conclusions of Law ("FOF/COL"),

issued on May 15, 2015, and the Judgment, issued on June 4, 2015,

in Adversary Proceeding No. 14-90019 ("Adversary Proceeding").

On November 11, 2015, Sebetich filed a document that this Court

construes as her brief ("Sebetich's Brief").  [Dkt. no. 12.]

Defendant/Appellee Alvin K. Woods ("Alvin Woods") filed his brief

("Woods's Brief") on October 29, 2015.[1]  [Dkt. no. 9.]  The Court

finds this matter suitable for disposition without a hearing

pursuant to Rule LR7.2(d) of the Local Rules of Practice of the

United States District Court for the District of Hawai`i ("Local

Rules").  After careful consideration of the briefs and the

relevant legal authority, the bankruptcy court's FOF/COL and its

Judgment are HEREBY AFFIRMED IN PART AND REVERSED IN PART, and

the case is HEREBY REMANDED to the bankruptcy court for the entry

of orders consistent with this Order.

## BACKGROUND

Except where specified below, Sebetich does not dispute

the findings of fact made by the bankruptcy court in the

Adversary Proceeding ("Adversary Court").

Sebetich and Clement K. Woods ("Clement Woods") are

brother and sister.  Clement Woods is Alvin Woods and

Clifford Woods's father, and Sebetich is their aunt.  In the

beginning of 2006, Alvin and Clifford Woods agreed to buy

Sebetich's house in Mililani, Hawai`i ("the Property") for

---

[1] Woods filed his brief in response to Sebetich's
"Designation of Record on Appeal" ("Designation"), filed on
September 29, 2015.  [Dkt. no. 8.]  On November 3, 2015, this
Court issued an entering order ("11/3/15 EO") concluding that it
could not construe the Designation as Sebetich's Fed. R. Bankr.
P. 8014(a) brief.  [Dkt. no. 11.]  The 11/3/15 EO gave Sebetich
until November 18, 2015 to file a brief that complied with
Rule 8014(a).  The 11/3/15 EO also allowed Woods to either file
an amended brief in response to Sebetich's new filing or to stand
on Woods's Brief.  Woods did not file an amended brief after the
filing of Sebetich's Brief.

$500,000.  They did not set a date by which Alvin and Clifford Woods would make payment.  [FOF/COL at 2, ¶¶ 1-2.[2]]  On May 16, 2006, Sebetich executed a deed conveying the Property to Alvin and Clifford Woods.  [Id. at ¶ 4.]

The Adversary Court found that, on May 18, 2006, Sebetich signed a letter – addressed "to whom it may concern" – stating that she was giving the Property to Alvin and Clifford Woods ("5/18/06 Letter").  The purpose of the 5/18/06 Letter was to enable Alvin and Clifford Woods to take out a loan secured by the Property.  Sebetich and Alvin and Clifford Woods knew that the letter was false because Alvin and Clifford Woods had agreed to pay Sebetich $500,000 for the Property.  [Id. at ¶ 5.]  Sebetich argues that the 5/18/06 Letter is fraudulent and that her signature on it is forged.  [Sebetich's Brief at 3 ("If there is a letter with my signature on gifting the Mililani Property.  It is a signature that is fraudulent.").[3]]  Sebetich attached the 5/18/06 Letter as an exhibit to her brief and wrote "Fraud" on it.  [Id. at 17.]

---

[2] The FOF/COL is one of the documents attached to Sebetich's Notice of Appeal and Statement of Election ("Notice of Appeal"), which the Adversary Court transmitted to this district court on June 18, 2015.  [Dkt. no. 1 at 4-15.]

[3] Sebetich's Brief has multiple attachments, but it is not consecutively paginated.  The page numbers in this Court's citations to Sebetich's Brief refer to the page numbers in the district court's electronic filing system.

In July 2006, Alvin and Clifford Woods obtained a $300,000 mortgage loan secured by the Property,[4] and they paid Sebetich $150,000 from the loan proceeds.  On September 20, 2006, Sebetich and Alvin and Clifford Woods signed a document stating that Alvin and Clifford Woods agreed to pay $350,000 for the Property ("Note").  In the Note, Alvin and Clifford Woods also agreed that, if they were unable to pay the $350,000 to Sebetich or in the event of their death, they would give the Property to Sebetich.  The Note did not include a deadline by which they were to pay the $350,000 to Sebetich.  [FOF/COL at 3, ¶¶ 6-7.]  Alvin and Clifford Woods did not make any payments on the $350,000 that they promised to pay Sebetich, even though they refinanced the mortgage on the Property in March 2007.  The principal amount of that loan was $472,500.  [Id. at 3-4, ¶¶ 9-10.]

In 2010, Sebetich sued Alvin and Clifford Woods in state court, alleging claims for breach of contract, unjust enrichment, breach of the implied covenant of good faith and fair dealing, and fraud ("State Court Action").  Alvin and Clifford Woods did not answer the complaint, and Sebetich obtained a default judgment against them for the $350,000, plus attorneys' fees and costs ("Default Judgment").  Sebetich recorded the

---

[4] Alvin and Clifford Woods obtained the $300,000 mortgage loan from Countrywide Home Loans ("Countrywide").  [Bankr. Adv. No. 14-90019, Decl. of Alvin K. Woods Direct Trial Testimony ("Alvin Woods Direct Decl."), filed 3/23/15 (dkt. no. 51), at ¶¶ 5-10.]

4

judgment, creating a lien on the Property, but she did not file suit to foreclose on the lien until December 17, 2013. [Id. at 4, ¶¶ 11, 13.]

On February 25, 2013, Alvin and Clifford Woods signed a quitclaim deed conveying a fifty percent interest in the Property to their parents, Clement and Irmgard Woods. All four signed another quitclaim deed on May 15, 2013, apparently to correct an error in the February 23, 2013 deed. [Id. at ¶ 12.]

Alvin Woods filed a Chapter 13 bankruptcy petition ("Petition") on January 14, 2014.[5] The Petition stated that he had only been employed for two weeks with Yamaguchi Business Services and that he had not begun work, but he believed he would earn gross wages of $946.00 per month. He also anticipated that he would receive $620.00 per month in family support. However, Alvin Woods's wages turned out to be less than he anticipated. [Id. at 4-5, ¶ 14.] At the time the Adversary Court issued the FOF/COL, Alvin Woods was unemployed. The Adversary Court noted that, because the Chapter 13 plan ("Plan") payments were current, Alvin Woods's family must be making the payments for him.[6] [Id. at 5, ¶ 16.] In addition, Alvin Woods stated in his bankruptcy

---

[5] Alvin Woods's Chapter 13 Proceeding is Bankruptcy Petition No. 14-00039.

[6] The proposed plan payments were $900 per month for sixty months. [FOF/COL at 5, ¶ 20.]

schedules that he owned a fifty percent interest in the Property. His interest was actually twenty-five percent.  [Id. at ¶ 17.]

The Adversary Court found that Alvin Woods did not intend to deceive anyone in connection with his Plan.  Although his statement about his wages turned out to be incorrect, when he made the statement, he believed he would earn that amount, and he did not intend to deceive anyone.  The Adversary Court found that Alvin Woods's misstatement about his interest in the Property was not intentional; Alvin Woods merely misunderstood the effect of the deeds that the Woodses executed.  [Id. at ¶¶ 15, 18-19.]  The Adversary Court also found that Alvin Woods's report of his anticipated family support was "substantially correct."  [Id. at ¶ 16.]

In addition to alleging that the 5/18/06 Letter is fraudulent, Sebetich apparently argues that Alvin and Clifford Woods later acknowledged that they could not pay, and they agreed that Sebetich could sell the house to satisfy the Note. [Sebetich's Brief at 2.]  However, she argues that Alvin Woods "[h]ad no intention in selling the property."  [Designation at 4.]  Thus, she alleges that Alvin Woods "deliberately and intentionally" gave false testimony about the Property. [Sebetich's Brief at 2.]  She also argues that Alvin Woods intentionally misstated his income in his Petition.  [Id. at 2-3.]

6

The FOF/COL notes that the bankruptcy court in
Alvin Woods's Chapter 13 Proceeding ("Chapter 13 Court")
confirmed his Plan and granted his motion to avoid Sebetich's
judgment lien.  No appeal was taken in the Chapter 13
Proceeding.[7]  [FOF/COL at 5, ¶ 20.]

On April 24, 2014, Sebetich filed a Complaint against
Alvin Woods, initiating the Adversary Proceeding, and she filed a
First Amended Complaint on June 6, 2014.  [Bankr. Adv. No. 14-
90019, dkt. nos. 2, 5.]  The defendants in the First Amended
Complaint were Alvin K. Woods, Clifford K. Woods, Irmgard
Ka`aoaolahilahi Woods, and Clement Kalawaiamoku Woods.  On
September 28, 2014, the Adversary Court issued an order granting
Clifford K. Woods, Irmgard Ka`aoaolahilahi Woods, and Clement
Kalawaiamoku Woods's Motion to Dismiss First Amended Complaint.
[Id., dkt. no. 32.]  On November 7, 2014, the Adversary Court
issued an order granting Sebetich leave to amend, and she filed
her Second Amended Complaint on November 11, 2014.  [Id., dkt.
nos. 42, 44.]  Alvin Woods is the only defendant named in the
Second Amended Complaint.  The Second Amended Complaint alleges
the following claims: nondischargeability of debt pursuant to 11
U.S.C. § 523(a)(2) ("Count I"); nondischargeability of debt
pursuant to § 523(a)(4) ("Count II"); nondischargeability of debt

_____

[7] The Chapter 13 Court issued the Order Confirming Chapter
13 Plan and the Order Granting Motion to Avoid Lien on May 15,
2014.  [Bankr. Case No. 14-00039, dkt. nos. 18, 19.]

pursuant to § 523(a)(6) ("Count III"); revocation of Chapter 13

plan pursuant to 11 U.S.C. § 1330 ("Count IV"); and a claim for

attorneys' fees pursuant to Haw. Rev. Stat. § 607-14.5 and

Travelers Casualty & Surety Co. of America v. Pacific Gas &

Electric Co., 549 U.S. 443 (2007) ("Count V").  On April 5, 2015,

Sebetich and Alvin Woods filed a stipulation to dismiss Counts II

and III.  [Id., dkt. no. 71.]

    The Adversary Court conducted a trial on April 7 and 8,

2015.  [Id., dkt. nos. 72, 74 (minutes of the proceedings).]  The

parties previously submitted the direct testimony of their

witnesses by declaration.  [Id., dkt. no. 48 (Sebetich's

declaration with exhibits), 51 (Alvin Woods's declaration with

exhibits), 52 (Clifford Woods's declaration with exhibits), 53

(Clement Woods's declaration).]  Sebetich also submitted a

rebuttal declaration.  [Id., dkt. no. 62.]  After the trial, the

parties submitted written closing and rebuttal arguments, [id.,

dkt. nos. 76-78,] and the Adversary Court issued the FOF/COL

thereafter.

    The Adversary Court found that, when Alvin and Clifford

Woods orally agreed to pay Sebetich $500,000 for the Property and

when they executed the Note as evidence of their agreement to pay

her the remaining $350,000, they intended to fulfill those

promises.  Thus, the Adversary Court concluded that Sebetich

could not prevail on her § 523(a)(2) claim that Alvin Woods's

debt to her was nondischargeable because he obtained the Property from her by "false pretenses, a false representation, or actual fraud." [FOF/COL at 7, ¶ 5.[8]]

The Adversary Court also rejected Sebetich's argument that res judicata effect of the Default Judgment requires a finding that Alvin Woods defrauded her. First, res judicata – *i.e.* claim preclusion – does not apply in proceedings to determine whether a debt is nondischargeable. Second, although issue preclusion – *i.e.* collateral estoppel – applies in such proceedings, the Default Judgment does not have preclusive effect because the State Court Action did not necessarily decide the issue of whether Alvin Woods defrauded Sebetich. [Id. at 7-9, ¶¶ 6-11.]

The Adversary Court also ruled in favor of Alvin Woods as to Count IV. It concluded that the misstatements in the bankruptcy schedules regarding his wages reflected his honest expectations; and the fact that his expectations did not materialize did not render the statements fraudulent. Further, Alvin Woods's representations about his family support were true when he made them and, at the time the Adversary Court issued the FOF/COL, his representations had proven true because his family

---

[8] Conclusion of Law paragraph 5 states that Sebetich "cannot prevail under section 523(a)(6)." In light of the preceding conclusions of law and the stipulation to dismiss Count III, this appears to be a typographic error that should refer to § 523(a)(2).

was contributing at least $620.00, if not more.  As to the misstatement about his ownership interest in the Property, the Adversary Court concluded that the misstatement of his interest in the Property was not prejudicial to his creditors because overstating his ownership interest would have resulted in a larger payment plan than otherwise required by law.  The Adversary Court therefore concluded that revocation of the confirmation order was not warranted because Alvin Woods did not intend to deceive the Chapter 13 Court, the bankruptcy trustee, or his creditors.  [Id. at 9-11, ¶¶ 12-20.]

The Adversary Court issued the Judgment on June 4, 2015,[9] and Sebetich timely filed her Notice of Appeal.

It is not clear exactly what issues Sebetich raises in the instant appeal.  The rule that pro se pleadings must be liberally construed also applies to the filings of a pro se party in a bankruptcy appeal.  See, e.g., In re Koncicky, 341 F. App'x 316, 318 (9th Cir. 2009) (citing Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988) ("pro se pleadings are liberally construed")).  Thus, liberally construing both the Designation and Sebetich's Brief, it appears that Sebetich raises the following issues on appeal: 1) her signature on the 5/18/06 Letter was forged; 2) Alvin Woods gave false testimony during his

---

[9] The Judgement is one of the documents attached to the Notice of Appeal.  [Dkt. no. 1 at 16-17.]

deposition; 3) Alvin Woods intentionally misled the Chapter 13 Court when he estimated his wages in his Petition; 4) Clifford Woods gave false testimony about Alvin Woods's intent to sell the Property to satisfy the Note; 5) because Alvin Woods never intended to sell the Property to satisfy the Note, he deliberately and intentionally misled her when he agreed to do so; 6) the Adversary Court made inappropriate comments about the case at the conclusion of the trial; and 7) the Adversary Court erred in its ruling that the Default Judgment did not have a preclusive effect.

## STANDARD

The following standards apply when a district court reviews an appeal from the bankruptcy court:

> This court reviews a bankruptcy court's findings of fact for clear error and its conclusions of law de novo. See In re Kimura (United States v. Battley), 969 F.2d 806, 810 (9th Cir. 1992) ("The court reviews the bankruptcy court's findings of fact under the clearly erroneous standard and its conclusions of law de novo."). The court "must accept the Bankruptcy Court's findings of fact, unless the court is left with the definite and firm conviction that a mistake has been committed. Mixed questions of law and fact are reviewed de novo." In re JTS Corp., 617 F.3d 1102, 1109 (9th Cir. 2010) (quotation marks and citations omitted).

In re Lee, CIVIL NO. 15-00278 SOM/RLP, 2015 WL 7274035, at *1 (D. Hawai`i Nov. 17, 2015). The United States Supreme Court has stated:

> [a] finding is 'clearly erroneous' when although
> there is evidence to support it, the reviewing
> court on the entire evidence is left with the
> definite and firm conviction that a mistake has
> been committed.  This standard plainly does not
> entitle a reviewing court to reverse the finding
> of the trier of fact simply because it is
> convinced that it would have decided the case
> differently.  The reviewing court oversteps the
> bounds of its duty under Fed. R. Civ. P. 52(a) if
> it undertakes to duplicate the role of the lower
> court.  In applying the clearly erroneous
> standard . . . , [reviewing] courts must
> constantly have in mind that their function is not
> to decide factual issues de novo.  If the [lower]
> court's account of the evidence is plausible in
> light of the record viewed in its entirety, the
> [reviewing court] may not reverse it even though
> convinced that had it been sitting as the trier of
> fact, it would have weighed the evidence
> differently.  Where there are two permissible
> views of the evidence, the factfinder's choice
> between them cannot be clearly erroneous.

Anderson v. City of Bessemer, 470 U.S. 564, 573-74 (1985) (some

alterations in Anderson) (citations and some internal quotation

marks omitted).  The standards described in Anderson apply when a

district court reviews the factual findings of a bankruptcy

court.  See, e.g., Ingram v. Burchard, 482 B.R. 313, 322 (N.D.

Cal. 2012); In re Daewoo Motor Am., Inc., 471 B.R. 721, 732 (C.D.

Cal. 2012), aff'd, 554 F. App'x 638 (9th Cir. 2014); In re

Folsom, Civil No. 10CV2440 L(NLS), 2011 WL 3489681, at *1 (S.D.

Cal. Aug. 8, 2011), aff'd sub nom., Folsom v. Davis, 513 F. App'x

651 (9th Cir. 2013).

## DISCUSSION

### I.   Whether the 5/18/06 Letter was Fraudulent

At the outset, this Court notes that it is not clear whether Sebetich argued before the Adversary Court that the 5/18/06 Letter was forged and/or that the letter was fraudulent.[10]  She did argue in her written closing argument that Alvin and Clifford Woods "dupe[d] her into deeding the [Property] over to them . . . and essentially st[ole] the home away from her via a claim of 'gift equity' generated by the nephews mortgagee." [Bankr. Adv. No. 14-90019, Sebetich's Closing Argument ("Sebetich's Closing"), filed 4/22/15 (dkt. no. 77), at 2.]  If Sebetich did not raise the forgery issue regarding the 5/18/06 Letter before the Adversary Court, she waived the argument and cannot raise it for the first time on appeal before this Court. See, e.g., In re Maui Indus. Loan & Fin. Co., Inc., Civil No. 13-00091 JMS/BMK, 2013 WL 2897792, at *3 (D. Hawai`i June 13, 2013) (noting that the appellant waived the issue on appeal because he "did not clearly raise the authentication objection before the bankruptcy court" (citing Pfingston v. Ronan Eng'g Co., 284 F.3d 999, 1003-04 (9th Cir. 2002) (explaining that a party must object in the district court to preserve an evidentiary challenge in summary judgment proceedings))); In re O'Kelley, Civil No. 09-

---

[10]  Sebetich was represented by counsel in the Adversary Proceeding.  This Court therefore does not liberally construe her filings in the Adversary Proceeding.

00360 JMS/KSC, 2009 WL 3209078, at *3 n.5 (D. Hawai`i Oct. 6, 2009) ("The court will not address arguments made for the first time on appeal and deems those arguments waived." (citing Beech Aircraft Corp. v. United States, 51 F.3d 834, 841 (9th Cir. 1995) (per curiam) ("Usually errors not raised in the trial court will not be considered on appeal."))).

Even if this Court found that Sebetich did not waive the forgery issue, her argument would fail on the merits.  The Adversary Court did not make a specific finding addressing Sebetich's argument that her signature on the 5/18/06 Letter was forged and that the letter was fraudulent.  The Adversary Court did find that: "On May 18, 2006, [Sebetich] signed a letter, addressed 'to whom it may concern,' stating that she was gifting the property to Alvin and Clifford [Woods]."  [FOF/COL at 2, ¶ 5.]  However, the Adversary Court also found that they knew the letter was false because they had agreed that Alvin and Clifford Woods would pay $500,000 for the Property.  [Id.]  Implicit in paragraph 5 is the finding that Sebetich herself signed the 5/18/06 Letter.

This Court cannot find that the Adversary Court's finding was clearly erroneous because there is ample evidence in the recording supporting the finding and no evidence supporting Sebetich's forgery argument.  In her appeal, Sebetich argues that both the 5/18/06 Letter and the Agreement to Sell/Purchase

14

between her and Alvin and Clifford Woods ("Sale Agreement") were fraudulent.[11] [Sebetich's Brief at 16-17.] The Sale Agreement and the 5/18/06 Letter were Alvin Woods's Exhibits B and C, respectively, at trial before the Adversary Court. During Sebetich's cross-examination, Alvin Woods's counsel asked her to look at Exhibit B. Sebetich confirmed that: it was the purchase agreement for the Property; the sales price was blank; it says that the closing costs would be paid by gift equity; and her signature is on the bottom left of the document. [Bankr. Adv. No. 14-90019, Tr. Trans. – Day 1 (4/7/15) ("4/7/15 Trans."), filed 8/11/15 (dkt. no. 105), at 20-21.] On re-direct examination, Sebetich testified that, when she signed the Sale Agreement, she did not know what the "gift equity" notation meant, and she did not know why there was no purchase price specified. [Id. at 29-30.]

During cross-examination, Alvin Woods's counsel asked Sebetich to look at Exhibit C. Sebetich confirmed that it was her signature on the 5/18/06 Letter and that the last sentence of the letter stated that she was gifting equity in the Property to Alvin and Clifford Woods. [Id. at 21-22.] On re-direct examination, Sebetich testified that her attorney at the time

---

[11] In the Sale Agreement, the line following "THE SELLERS AGREE TO SELL AND BUYERS AGREE TO PURCHASE ABOVE-MENTIONED PROPERTY FOR A SALES PRICE OF $" is blank. Following "CLOSING COSTS ARE TO BE PAID BY:" there is a handwritten notation "gift equity." [Sebetich's Brief at 16 (emphases in original).]

prepared the letter, and Sebetich read it before signing it.  She protested that the letter incorrectly refers to Alvin and Clifford Woods as her sons – not her nephews – but she signed the letter in spite of the error because she trusted Alvin Woods. [Id. at 31-32.]  She explained that, at the time, her "husband was in a coma, and [she] was very vulnerable, and . . . most of the time [she] just trusted" Alvin and Clifford Woods.  [Id. at 32.]  She also testified that, when she signed the 5/18/06 Letter, she did not know what the equity in the Property was, and she did know what gifting the equity meant.  [Id. at 32-33.] According to Alvin Woods's testimony, Countrywide wrote the 5/18/06 Letter and emailed it to him to obtain Sebetich's signature.  He printed it out, took it to her, and she signed it. [Id. at 61-63.]

Based on the evidence presented at trial that Sebetich signed the letter and the lack of evidence to support her argument on appeal that the signature was forged, this Court rejects Sebetich's argument that the Adversary Court's finding that Sebetich signed the letter was clearly erroneous. Sebetich's appeal is DENIED as to this issue.

## II.  Arguments Regarding Alvin Woods's Statements and Testimony

Sebetich next makes several arguments challenging the Adversary Court's findings regarding Alvin Woods's statements in his Petition and his testimony in the Adversary Proceedings.

This Court first turns to her arguments regarding Alvin Woods's testimony at his deposition and at trial.

## A.  <u>Alvin Woods's Deposition</u>

Sebetich argues that Alvin Woods gave false testimony during his deposition.  She argues that "every word that Alvin K. Woods said in his deposition is not the truth."  [Designation at 4 (emphases omitted).]  Based on her brief and the attachments thereto, it appears that Sebetich's primary objection is to his testimony regarding: 1) his mother's employment; and 2) his employment.  [Sebetich's Brief at 4-7.]  At his deposition, Alvin Woods testified that his mother works for Roberts Bus Company.  [<u>Id.</u> at 6.[12]]  Sebetich argues that this testimony was false because Irmgard Woods worked for Yamaguchi Bus Company for over twenty years.  [<u>Id.</u> at 4.]

Even assuming, for the sake of argument, that Sebetich is correct about Irmgard Woods's employment, it would not affect the disposition of this case because the Adversary Court made no finding of fact or conclusion of law regarding Irmgard Woods's

---

[12] Pages 6-7 of Sebetich's Brief are excerpts of the transcript of Alvin Woods's February 13, 2015 deposition ("Alvin Woods Depo.") with certain pages that she apparently highlighted. The complete deposition transcript was filed in the Adversary Proceeding as Sebetich's Exhibit 3.  [Bankr. Adv. No. 14-90019, Decl. of Direct Testimony of Victoria Sebetich ("Sebetich Direct Decl."), filed 3/9/15 (dkt. no. 48), Exh. 3 at 31-48.]  The Sebetich Direct Declaration, which has multiple exhibits, is docketed as a single document.  This Court's citations to the Sebetich Direct Declaration refer to the page numbers in the bankruptcy court's electronic filing system.

employment.   The Adversary Court found that Alvin Woods's estimation of his family support was "substantially correct." [FOF/COL at 5, ¶ 16.]   The Adversary Court also concluded that Alvin Woods's family must be making his plan payments for him. [Id. at 11, ¶ 17.]   However, there is nothing in the FOF/COL which indicates that either that finding or that conclusion was based upon Alvin Woods's deposition testimony about Irmgard Woods's employment.

As to Sebetich's argument that Alvin Woods gave false testimony during his deposition about his employment with "Yamaguchi Bus Service" ("Yamaguchi"), this Court notes that Sebetich's counsel questioned Alvin Woods on cross-examination about his work with Yamaguchi, including whether his representations in his Petition were accurate.   [4/7/15 Trans. at 80-85; Bankr. Adv. No. 14-90019, Tr. Trans. - Day 2 (4/8/15) ("4/8/15 Trans."), filed 8/11/15 (dkt. no. 106), at 5-9.] Sebetich's counsel could have confronted Alvin Woods with his deposition testimony regarding his employment, as evidenced by the fact that counsel questioned him about his deposition testimony concerning the estimated $620.00 in family support. [4/7/15 Trans. at 13-18.]   Further, Sebetich and her counsel clearly placed the issues regarding Alvin Woods's employment before the Adversary Court.   See, e.g., Sebetich Direct Decl. at ¶ 10.g (arguing that Alvin Woods deceived the Chapter 13 Court

18

"concerning his ability as debtor to pay the plan submitted" (citing Alvin Woods Depo. Trans. at 20:15 to 23:25)); Sebetich's Closing at 8 (arguing that there are six reasons why Alvin Woods committed fraud upon the Chapter 13 Court, including making statements about his employment that were untrue or were in reckless disregard for the truth).

Under the circumstances of this case, this Court concludes that, even if Alvin Woods made false statements during his deposition, they were not relevant to the outcome of the Adversary Proceedings.  To the extent that Sebetich urges this Court to reverse the Adversary Court's decision because Alvin Woods allegedly gave false testimony during his deposition, her appeal is DENIED.

### B.  Attempted Sale of the Property

According to Sebetich, she spoke with Alvin and Clifford Woods "in early 2008" about selling the Property to repay the amount reflected in the Note.  [Sebetich Direct Decl. at ¶ 4.]  She states that they agreed to sell the Property, but, after she obtained an appraisal in September 2008 and secured a buyer, they refused to cooperate to complete the sale.  [Id.] The Property was eventually listed for sale on June 8, 2009, but the listing was withdrawn on September 22, 2009.  [Bankr. Adv. No. 14-90019, Decl. of Rebuttal Testimony of Victoria Sebetich

("Sebetich Rebuttal Decl."), filed 3/31/15 (dkt. no. 62), at ¶ 5.]

In his declaration, Alvin Woods denied telling Sebetich in 2008 that he would sell the Property. He stated that he "knew nothing about any effort to sell the house until [Clifford Woods] told [him] recently, in preparing for trial in this lawsuit, that he had listed the house for sale in 2008." [Alvin Woods Direct Decl. at ¶ 15.] During his cross-examination at trial, Alvin Woods stated that Clifford Woods put the Property on the market, and he did not know about it "until after." [4/7/15 Trans. at 73.] Alvin Woods testified that: he lived at the Property continuously between June and September of 2009; he once saw a for sale sign in front of the house; there was an open house held by Rosita Valdez, the real estate agent; and he saw a flyer about the listing for the Property in the kitchen between June and September 2009. However, he did not remember when Clifford Woods told him that the Property was on the market, and he denied meeting Ms. Valdez. [Id. at 74-77.] Alvin Woods ultimately admitted that, between June and September 2009, he knew that the Property was for sale. He stated that he "was confused" during the earlier testimony about when he first learned the Property was for sale. [Id. at 78.]

Clifford Woods testified that, in 2009, he and Sebetich discussed selling the Property. [4/8/15 Trans. at 89.] He never

told Alvin Woods about listing the Property for sale. [Id. at 73.] In fact, Alvin Woods was not living at the Property during the period when the Property was listed.[13] [Id. at 75.]

Ms. Valdez testified that, Clifford Woods signed the listing agreement in front of her, but Alvin Woods was not home at the time. She left the paperwork with Clifford Woods to have his brother sign, and she went back later to pick it up. [Id. at 82-83.] According to Ms. Valdez, Clifford Woods called her the morning of her trial testimony, and they discussed the listing. He told her that he signed the listing agreement. Ms. Valdez understood this to mean that Alvin Woods did not sign the listing agreement, and Clifford Woods signed Alvin Woods's name. [Id. at 85.]

Sebetich argues that the testimony shows that Clifford Woods "committed fraud, and lied to the" Adversary Court. [Designation at 4.] After Ms. Valdez testified, Alvin Woods's counsel resumed her re-direct examination of Clifford Woods. Sebetich's counsel declined further cross-examination. [Id. at 86-89.] Thus, although Sebetich's counsel had the opportunity to question Clifford Woods about Ms. Valdez's testimony that he signed Alvin Woods's name on the listing agreement, he did not do so, and Clifford Woods did not have to

---

[13] Clement Woods also testified that, when he and his wife moved into the Property with Clifford Woods, Alvin Woods was not living there. [4/8/15 Trans. at 96.]

respond to Ms. Valdez's allegation.  The Adversary Court made no findings of fact regarding any of the circumstances surrounding the attempted sale of the Property in 2009.  Even assuming, *arguendo*, that Clifford Woods did sign Alvin Woods's name on the listing agreement, that would not render any of the Adversary Court's findings of fact clearly erroneous.  To the extent that Sebetich argues the Adversary Court's decision should be reversed because of Clifford Woods's allegedly false testimony and his alleged signing of Alvin Woods's name on the listing agreement, her appeal is DENIED.

Sebetich also argues that Clifford Woods's and Ms. Valdez's testimony establishes that Alvin Woods had no intention of selling the Property to pay the Note, and therefore he deliberately and intentionally misled Sebetich when he agreed to do so.  First, there is conflicting testimony about whether Alvin Woods agreed to sell the Property to pay Sebetich. Sebetich stated that she met with Alvin and Clifford Woods in 2008 and both agreed to sell the Property.  [Sebetich Direct Decl. at ¶ 4.]  Alvin Woods's declaration states that he did not know about any effort to sell the Property until his brother told him about it during trial preparation.  [Alvin Woods Direct Decl. at ¶ 15]  At trial, however, Alvin Woods admitted that he did speak with Sebetich about selling the Property.  [4/8/15 Trans.

at 46.]  Clifford Woods testified that it was he who talked to Sebetich about selling the Property in 2009.  [Id. at 89.]

As previously noted, the Adversary Court did not make any finding of fact regarding the attempted sale of the Property in 2009.  Thus, this Court cannot determine whose testimony the Adversary Court found to be more credible.  It is not necessary for this Court to determine whether, in either 2008 or 2009, Alvin Woods told Sebetich that he would sell the Property to pay her and whether, if he did make such a statement, whether he actually intended to do so when he made the statement because those issues are not relevant to Sebetich's claims.  Count I alleges that the $350,000 debt reflected in the Note is not dischargeable in bankruptcy pursuant to 11 U.S.C. § 523(a)(2). Section 523(a) states, in pertinent part:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--
>
> . . . .
>
> (2)  for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>
> > (A)  false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
> >
> > (B)  use of a statement in writing--
> >
> > > (i)  that is materially false;

23

> (ii) respecting the debtor's or an insider's financial condition;
>
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>
> (iv) that the debtor caused to be made or published with intent to deceive[.]

Although this Court understands that the attempted sale of the Property in 2009 was a significant event to the parties, it is not relevant to the merits of Count I.  Count I turns upon whether Alvin Woods obtained the Property from Sebetich through "false pretenses, a false representation, or actual fraud."  At the times relevant to the attempted sale of the Property, Sebetich had already conveyed the Property to Alvin and Clifford Woods, and she had already agreed to accept the Note as evidence of the remaining $350,000 that they owed her for the Property. Even assuming, *arguendo*, that Alvin Woods told Sebetich in either 2008 or 2009 that he would sell the Property to satisfy the Note, and assuming further that such representation was false, he did not obtain the Property – or anything else – from her as a result of that representation.  To the extent that Sebetich urges this Court to reverse the Adversary Court's decision because Alvin Woods deliberately and intentionally misled her when agreed to sell the Property to satisfy the Note, her appeal is DENIED.

C.   __Alvin Woods's Statements Regarding His Employment__

In Schedule I of his Petition, Alvin Woods wrote that he had been employed with "Yamaguchi Business Services" for 2 weeks, and he listed his monthly gross wages as $946.00.[14] [Sebetich's Brief at 14.[15]]  However, Yamaguchi's payroll records reflect that the start date of Alvin Woods's employment was January 16, 2014, and Alvin Woods only worked forty-four hours, earning gross wages of $448.00, for the entire quarter ending March 31, 2014.  [__Id.__ at 12; Sebetich Direct Decl., Exh. 13 at 134.]  At trial, Alvin Woods testified that, during his employment with Yamaguchi, those forty-four hours were the only hours that he actually worked.  [4/7/15 Trans. at 84.]  At his deposition, Alvin Woods testified that he worked with Yamaguchi from "January 2014 to May."  [Sebetich's Brief at 7 (Alvin Woods Depo. at 21); Sebetich Direct Decl., Exh. 3 at 37 (same).]

Count IV of Sebetich's Second Amended Complaint alleges that Alvin Woods's statements in his Petition about his employment with Yamaguchi were "a sham" and were "in bad faith," but the Chapter 13 Court relied upon them in approving Alvin Woods's Plan.  [Bankr. Adv. No. 14-90019, Second Amended

_____

[14] Alvin Woods signed the Petition on January 14, 2014. [Sebetich Direct Decl., Exh. 3 at 93.]

[15] Pages 14-15 of Sebetich's Brief are highlighted excerpts of Alvin Woods's Petition.  A complete copy of the Petition was filed in the Adversary Proceeding as Sebetich's Exhibit 6. [Sebetich Direct Decl. at 64-110.]

Complaint at ¶ 31.g.]  Count IV therefore seeks revocation of
Alvin Woods's Plan.

In ruling in favor of Alvin Woods on Count IV, the
Adversary Court found that, when Alvin Woods signed the Petition,
"he had just been hired . . . and had not yet begun to work," but
he "believed that he would earn" $946.00 per month.  [FOF/COL at
4-5, ¶ 14.]  The Adversary Court also found that Alvin Woods "did
not know that his statement about his anticipated future income
was incorrect and did not intend to deceive anyone when he made
that statement." [Id. at 5, ¶ 15.]  Sebetich's Brief, liberally
construed, argues that the Adversary Court's findings of fact
were clearly erroneous because Alvin Woods's statements about his
employment were false and in bad faith.  [Sebetich's Brief at 2-
3.]

Alvin Woods did testify during re-direct examination
that, at the end of December 2013, he spoke with Cheryl Paris
about a job with Yamaguchi.  [4/8/15 Trans. at 41.]  Previously
on cross-examination, Alvin Woods admitted that he had not been
working for Yamaguchi for two weeks prior to signing the
Petition.  [Id. at 5-6.]

At his deposition, Alvin Woods testified that his
employment with Yamaguchi was part-time bus aid or driver.  He
said that, "[i]f nobody [came] in then [he could] take the spot
to do it."  [Sebetich's Brief at 7 (Alvin Woods Depo. at 21);

Sebetich Direct Decl., Exh. 3 at 37 (same).]  At trial, he
confirmed that the position was on-call.  [4/7/15 Trans. at 80.]
Further, when Sebetich's counsel questioned him about how he
arrived at the amount of $946.00 in gross monthly wages that he
wrote on his Petition, he testified: "I got that from [Cheryl –
who he referred to as the boss], the pay that I was supposed to
get every hour, and I gave it to Blake [Goodman, Esq. – the
attorney who signed the Petition], and then that's how Blake
determined the money." [4/8/15 Trans. at 7.]  Thus, the only
information that Yamaguchi provided to Alvin Woods was his pay
rate; he and his counsel apparently guessed the number of hours
that he would work.  Alvin Woods admitted that he did not have an
employment contract with Yamaguchi.  [4/7/15 Trans. at 80-81.]
Alvin Woods testified that, at the time he signed the Petition,
he "expect[ed] to be earning money from Yamaguchi Bus," and he
had no "reason to expect that job wouldn't last." [4/8/15 Trans.
at 39-40.]  However, there is no evidence in the record which
supports the Adversary Court's finding that, at the time
Alvin Woods signed the Petition, he believed that he would work
enough hours at Yamaguchi to earn monthly wages of $946.00.

       Alvin Woods also testified during his deposition that
he did not work any hours from February through May 2014 because
the company did not need him.  However, he did not tell either
the bankruptcy trustee or his attorneys that he was not working

during that period. [Sebetich's Brief at 7 (Alvin Woods Depo. at 23-24); Sebetich Direct Decl., Exh. 3 at 37 (same).] At his deposition, Alvin Woods testified that, when he applied for the job at Yamaguchi, he did not intend to file for bankruptcy, and he could not remember when he decided to file for bankruptcy. [Sebetich's Brief at 7 (Alvin Woods Depo. at 24); Sebetich Direct Decl., Exh. 3 at 37 (same).] However, at trial, Alvin Woods admitted that the reason he sought a job with Yamaguchi was "I wouldn't be able to file bankruptcy unless I found a job." [4/8/15 Trans. at 22.] He also acknowledged that the reason he filed for bankruptcy was that he was served with Sebetich's Foreclosure Action. [Id. at 23.[16]]

There is **some** evidence in the record which supports the Adversary Court's finding that, when Alvin Woods signed the Petition, he believed he would earn $946.00 per month working for Yamaguchi. However, Alvin Woods himself never testified that he believed he would earn any specific amount – let alone $946.00 per month – and he testified that his counsel arrived at that amount based only on the hourly rate provided by Yamaguchi. This Court has considered the entire record as a whole, including, in particular, Alvin Woods's testimony that: the reason he applied for the job with Yamaguchi was so that he could file for

---

[16] See also 4/8/15 Trans. at 29 ("She try to foreclose on the Mililani house and that's why I filed for bankruptcy to save my home. That's how this all started.").

28

bankruptcy; he filed for bankruptcy because of the Foreclosure Action; and he did not inform anyone that he did not work any hours with Yamaguchi from February 2014 to May 2014.  This Court has also considered the inconsistencies in Alvin Woods's testimony, such as the inconsistencies regarding the attempted sale of the Property and about when he decided to file bankruptcy.

In the conclusions of law, the Adversary Court reiterated that Alvin Woods "honestly expected to earn the amount reflected in his schedules," and concluded that although "[t]he expected income did not materialize, . . . that does not amount to fraud."  [FOF/COL at 10, ¶ 15.]  The Adversary Court also concluded that Alvin Woods's "representation about his employment status and income were not material, and the court did not rely on them to confirm his plan, because family contributions, not wage income, were the primary funding source."  [Id. at 10-11, ¶ 16.]  This Court must not reverse where the Adversary Court's account of the evidence is plausible in light of the record viewed in its entirety, even though this Court sitting as the trier of fact may have ruled differently.  The issue of whether Alvin Woods earned regular wages is material because, without some amount of regular wages – even if less than the estimated $946.00, the Adversary Court could have concluded that he was not

eligible for Chapter 13 bankruptcy.  The United States Supreme

Court has stated:

> Chapter 13 of the Bankruptcy Code provides
> bankruptcy protection to "individual[s] with
> regular income" whose debts fall within statutory
> limits.  11 U.S.C. §§ 101(30), 109(e).  Unlike
> debtors who file under Chapter 7 and must
> liquidate their nonexempt assets in order to pay
> creditors, see [11 U.S.C.] §§ 704(a)(1), 726,
> Chapter 13 debtors are permitted to keep their
> property, but they must agree to a court-approved
> plan under which they pay creditors out of their
> future income, see [11 U.S.C.] §§ 1306(b), 1321,
> 1322(a)(1), 1328(a). . . .

Hamilton v. Lanning, 560 U.S. 505, 508 (2010) (some alterations

in Hamilton).  "The term 'individual with regular income' means

[an] individual whose income is sufficiently stable and regular

to enable such individual to make payments under a plan under

chapter 13 of this title, other than a stockbroker or a commodity

broker."  11 U.S.C. § 101(30).  Based upon this definition, the

source of the income is generally irrelevant, and the critical

inquiry is whether the income is "stable and regular."  See,

e.g., In re Santiago-Monteverde, 512 B.R. 432, 438 (S.D.N.Y.

2014) ("a substantial majority of courts have concluded that the

type or source of an individual's income is generally irrelevant

to the issue of eligibility so long as the income is, in the

words of the statute, 'stable and regular'").

Although it was arguably possible for Alvin Woods to

establish "regular income" from family contributions alone, it

would have been a closer question from the outset of the

Chapter 13 Proceedings.  Morever, Count IV of the Adversary Proceeding did not only involve a determination of whether Alvin Woods could have obtained plan approval without regular wages; it also involved the issue of whether he made the representations about his employment with Yamaguchi in an attempt to deceive the Chapter 13 Court.  While Alvin Woods's motivation for finding employment and his reporting of wages may be suspect, this Court does not disturb the Adversary Court's conclusion that Alvin Woods's representations about his employment did "not amount to fraud."  This Court therefore CONCLUDES that the Adversary Court did not err when it ruled in favor of Alvin Woods as to Count IV of Sebetich's Second Amended Complaint.

III. **The Adversary Court's Comments About the Case**

          Sebetich argues that, at the end of the trial, the Adversary Court made inappropriate comments about the case.  According to Sebetich, the Adversary Court stated that "the family had bad bloodline, and there will be only one winner and one loser."  [Designation at 4.]  First, it was Alvin Woods's counsel who referred to "the family bad blood" in the opening statement.  [4/7/15 Trans. at 53.]  The Adversary Court did not adopt that statement in any way.  The Adversary Court's remarks at the close of trial were as follows:

> I'm going to decide the legal issues that you've
> put in front of me.  That's my job.  I will do
> that.  That will settle the legal issues, but I
> can't do anything about the family problem.

Okay.  That's a much more profound problem
that I can't help you with, and it's much, much,
much more important.  Okay.  I can tell that there
is a long history of problems within this family.
You don't need to tell me about that.  I am – it
pains me to see that.  I would hope that you could
find a way to start healing those problems, and I
think one good start would be to find a solution
to this legal dispute that both sides can't [sic]
agree on.

And I think that's particularly important,
because when I decide this, there's going to be a
winner and there's going to be a loser.  You know,
somebody's going to win, somebody's going to lose
and that's going to make the family problems even
worse.  You know, that's going to make everybody

harder.  You know, everybody's position is going
to get harder.

So you've got an opportunity now to start
bringing your family back together again, which,
you know, may be the last opportunity you have to
do that and that's really way more important than
the money.  Okay.  So I just hope you'll do that.
You've got some time before I'll decide, and I
hope you'll use that time. . . .

[4/8/15 Trans. at 117-18.]

Sebetich is correct that the Adversary Court said that,

when he issued his decision, there would be one winner and one

loser.  The Adversary Court also noted that there were family

problems.  The Adversary Court made these statements while

encouraging the parties to try to resolve the dispute and reach a

mutually agreeable solution amongst themselves before it issued

the ruling on Sebetich's claims.  Sebetich argues that the

statements made her feel "very uncomfortable."  [Designation at

4.]  While this Court understands that the trial presented

emotional issues for Sebetich and that the experience was
difficult for her, the Adversary Court's statements were
accurate, and this Court finds that there was nothing improper
about them.  To the extent that Sebetich argues the Adversary
Court's comments at the conclusion of the trial were
inappropriate and warrant reversal of the Adversary Court's
decision, her appeal is DENIED.

**IV.  <u>Effect of the Default Judgment</u>**

Sebetich's final point on appeal is that Adversary
Court erred in its rulings regarding the effect of the Default
Judgment.  Sebetich argued that, under the res judicata doctrine,
the Default Judgment was conclusive proof that Alvin and Clifford
Woods committed fraud.  [Sebetich's Closing Argument at 3.]  The
Adversary Court rejected this argument on the ground that res
judicata/claim preclusion does not apply in nondischargeability
proceedings.  The Adversary Court recognized that collateral
estoppel/issue preclusion applies, but concluded that the Default
Judgment did not have a preclusive effect in this case.  [FOF/COL
at 8-9, ¶¶ 7-11.]  Although fraud was one of the claims that
Sebetich alleged in the State Court Action, there were other
claims as well, and "the state court did not specify which of the
claims the court adopted."  [<u>Id.</u> at 9, ¶ 10.]  Thus, the
Adversary Court concluded that the issue of fraud was not
necessarily decided in the State Court Action.  [<u>Id.</u> at ¶ 11.]

The Ninth Circuit has stated that:

[C]entral to the operation of the bankruptcy courts is the idea that the debtor's debts, including debts liquidated to judgments, may be modified and discharged.  See, e.g., 11 U.S.C. §§ 544, 547, 548, 549, 727, 1129, 1141, 1325, 1328.

In short, "[f]inal judgments in state courts are not necessarily preclusive in United States bankruptcy courts." Gruntz [v. Cty. of Los Angeles], 202 F.3d [1074,] 1079 [(9th Cir. 2000) (en banc)]. . . .

This does not, of course, mean that the preclusion doctrines do not have any bearing on federal bankruptcy discharge proceedings.  The Supreme Court has stated that "collateral estoppel principles do indeed apply in discharge exception proceedings pursuant to § 523(a)." Grogan [v. Garner], 498 U.S. [279,] 284 n.11, 111 S. Ct. 654 [(1991)].  Further, we have held that "[t]he full faith and credit requirement of § 1738 compels a bankruptcy court in a § 523(a)(2)(A) nondischargeability proceeding to give collateral estoppel effect to a prior state court judgment." Gayden v. Nourbakhsh (In re Nourbakhsh), 67 F.3d 798, 801 (9th Cir. 1995) (per curiam).

In the bankruptcy discharge context, this means that "[i]f, in the course of adjudicating a state-law question, a state court should determine factual issues using standards identical to those of [§ 523], then collateral estoppel, in the absence of countervailing statutory policy, would bar relitigation of those issues in the bankruptcy court." Brown [v. Felsen], 442 U.S. [127,] 139 n.10, 99 S. Ct. 2205 [(1979)].  The classic example of the proper use of issue preclusion in discharge proceeding is when the amount of the debt has been determined by the state court and reduced to judgment.  In that event, if there are no new issues, the bankruptcy court should ordinarily decline to allow the parties to relitigate the debt amount and should give the state court judgment as to the amount of preclusive effect.  Comer v. Comer (In re Comer),

723 F.2d 737, 740 (9th Cir. 1984).  For the same reason, we have held that if the issue of fraud had been litigated in state court, the state court judgment would preclude relitigation of the same issue by the bankruptcy court in discharge proceedings.  <u>Nourbakhsh</u>, 67 F.3d at 801.  Thus, the doctrines of preclusion play an important part in dischargeability proceedings by preventing the relitigation of factual and legal issues already determined by other courts.

However, a preexisting judgment does not have preclusive effect on the bankruptcy court's determination of dischargeability.  The Supreme Court firmly rejected such an idea in <u>Brown</u>, specifically holding that "the bankruptcy court is not confined to a review of the judgment and record in the prior state-court proceedings when considering the dischargeability of respondent's debt."  <u>Brown</u>, 442 U.S. at 138-39, 99 S. Ct. 2205. We explained this analytical distinction in <u>Comer</u>:

> *Res judicata* should not be applied to bar a claim by a party in bankruptcy proceedings, nor should a bankruptcy judge rely solely on state court judgments when determining the nature of a debt for purposes of dischargeability, if doing so would prohibit the bankruptcy court from exercising its exclusive jurisdiction to determine dischargeability.

<u>In re Comer</u>, 723 F.2d at 740.

As we explained in <u>Comer</u>, determination of the amount of the debt by the state court did not impact the dischargeability decision:

> In the present case, applying *res judicata* to bar the bankruptcy court from looking behind the default judgment to determine the actual amount of the obligation would not preclude the exercise of the bankruptcy court's exclusive jurisdiction to determine the nature of the subject debt for purposes of dischargeability.

<u>Id.</u> . . .

35

In re Sasson, 424 F.3d 864, 872-73 (9th Cir. 2005) (some alterations in Sasson) (footnote omitted).  Thus, the Adversary Court was correct when it ruled that the res judicata/claim preclusion doctrine did not apply, but that collateral estoppel/issue preclusion principles apply.

> The Ninth Circuit has stated that,

> > in order to determine the preclusive effect of a state court judgment in a subsequent federal lawsuit, courts must decide (1) whether, under the applicable state law, the state court judgment should be given collateral estoppel effect, and (2) if so, whether an exception to the full faith and credit statute should apply.

In re Litwak, No. 99-55678, 2000 WL 531764, at *1 (9th Cir. May 2, 2000) (citing Nourbakhsh v. Gayden, 67 F.3d 798, 800 (9th Cir. 1995)).  Thus, the Adversary Court was correct when it ruled that it must apply Hawai`i law to determine whether the Default Judgment has preclusive effect.

> Under Hawai`i law, "a default judgment is a final judgment to which collateral estoppel applies, Medeiros v. First Ins. Co., 50 Haw. 401, 403, 441 P.2d 341, 344 (1968), unless the default judgment is void."  Fuller v. Pac. Med. Collections, Inc., 78 Hawai`i 213, 219, 891 P.2d 300, 306 (Ct. App. 1995) (citing Matsushima v. Rego, 67 Haw. 556, 560, 696 P.2d 843, 846 (1985) (res judicata does not apply to void default judgments)). In the instant case, there is no indication in the record that the Default Judgment is void.  Hawai`i courts apply the following

four-part test to determine whether the collateral estoppel/issue

preclusion doctrine applies:

> the doctrine of collateral estoppel [or issue
> preclusion] bars relitigation of an issue where:
> (1) the issue decided in the prior adjudication is
> identical to the one presented in the action in
> question; (2) there is a final judgment on the
> merits; (3) the issue decided in the prior
> adjudication was essential to the final judgment;
> and (4) the party against whom collateral estoppel
> is asserted was a party or in privity with a party
> to the prior adjudication[.]

Simmons v. Samulewicz, 129 Hawai`i 507, 512, 304 P.3d 648, 653

(Ct. App. 2013) (alteration in Simmons) (quoting Dorrance v. Lee,

90 Hawai`i 143, 149, 976 P.2d 904, 910 (1999)).

In the instant case, it is undisputed that the Default

Judgment is a final judgment on the merits, and that Alvin Woods

was a party in the prior case.  Count IV of the Complaint in the

State Court Action alleged that Alvin and Clifford Woods "falsely

represented that they were ready, willing and able to pay for the

real property inducing [Sebetich] to deliver title and

possession" of the Property.  [Sebetich Direct Decl., Exh. 4 at

59, ¶ 19.]  In the Adversary Proceeding, the issue was whether

Alvin Woods incurred a debt and obtained the Property by "false

pretenses, a false representation, or actual fraud."  See

§ 523(a)(2)(A).  This Court therefore finds that the relevant

issue presented in Count IV of the State Court Action is

identical to the relevant issue in Count I of the Adversary

Proceeding.

As to the third requirement – that the issue was "essential to the final judgment" in the prior proceeding – the Adversary Court concluded that the issue of fraud was not necessarily decided in the State Court Action because "the state court's judgment could have been based solely on a breach of contract theory." [FOF/COL at 9, ¶ 11.] It is true that, where the plaintiff only alleged one claim, the court's ruling on that claim is essential to the judgment. See Flores v. Barretto, 99 Hawai`i 270, 280, 54 P.3d 441, 451 (2002) ("The sole issue in the arbitration was whether the treatment prescribed under the December 1993 Plan was compensable. Therefore, that determination was clearly essential to the arbitrator's final award."). However, there is no Hawai`i case law suggesting that the disposition of a claim is **only** deemed to be essential to the judgment if that was the only claim alleged in the case or if the judgment expressly listed all of the claims that the party seeking to invoke issue preclusion prevailed upon in the prior proceeding. The Adversary Court concluded that, because the Default Judgment could have been based solely on Sebetich's breach of contract claim – Count II in the State Court Action, the disposition of Count IV was not essential to the judgment. By virtue of Alvin and Clifford Woods's failure to respond to the State Court Action, Sebetich obtained an entry of default, and ultimately the Default Judgment, on all of her claims that were

within the prayer for relief in her complaint and which arose

from the facts stated in her complaint.  See Matsushima v. Rego,

67 Haw. 556, 559, 696 P.2d 843, 845 (1985) ("Generally, a default

judgment constitutes a binding adjudication of all the rights of

the parties embraced in the prayer for relief which arise from

the facts stated in the complaint."); see also Brown v.

Progressive Direct Ins. Co., No. 29348, 2010 WL 1806031, at *6

(Hawai`i Ct. App. May 5, 2010) (stating that, in Matsushima, the

Hawai`i Supreme Court noted that "default judgments are valid

judgments for res judicata purposes for all claims within the

scope of relief for which a party prays").  In the State Court

Action, Sebetich's fraud claim was within the scope of the relief

she sought in the complaint, and the facts stated in the

complaint did support the fraud claim.  This Court therefore

CONCLUDES that the Adversary Court erred when it concluded that

the Default Judgment in the State Court action could have been

based solely on a breach of contract theory.

     In addition, this Court notes that, under Hawai`i law,

default judgments – whether entered by the court clerk or the

court – are appealable and "immediately reviewable by the court

of appeals." Casuga v. Blanco, 99 Hawai`i 44, 51, 52 P.3d 298,

305 (Ct. App. 2002) (citation and internal quotation marks

omitted).  Because Alvin and Clifford Woods could have appealed

the disposition of Count IV, as well as the disposition of any of

39

the other counts in the State Court Action, this Court cannot agree with the Adversary Court's conclusion that the disposition of the fraud claim was not essential to the judgment. <u>See</u> <u>Dorrance v. Lee</u>, 90 Hawai`i 143, 149, 976 P.2d 904, 910 (1999) ("determinations that are not essential to the judgment 'have the characteristics of dicta[] and may not ordinarily be the subject of an appeal by the party against whom they were made'" (alteration in <u>Dorrance</u>) (some citations omitted) (quoting Restatement (Second) of Judgments § 27 cmt. h (1980))).

This Court concludes that the disposition of Sebetich's fraud claim in the State Court Action was essential to the judgment in that case. Thus, this Court CONCLUDES that all of the requirements for collateral estoppel/issue preclusion were satisfied, and therefore the ruling in the State Court Action that Alvin and Clifford Woods obtained the Property by fraud was entitled to preclusive effect in the Adversary Proceeding. Insofar as the Adversary Court concluded that collateral estoppel/issue preclusion did not apply to the state court fraud ruling, Sebetich's appeal is GRANTED and the Adversary Court's decision in favor of Alvin Woods as to Count I of Sebetich's Second Amended Complaint is REVERSED.

V.   <u>**Summary**</u>

This Court has REVERSED the Adversary Court's FOF/COL as to its ruling in favor of Alvin Woods on Count I of Sebetich's

Second Amended Complaint.   This Court has denied Sebetich's
Appeal as to all of her arguments regarding Count IV of the
Second Amended Complaint.   This Court therefore AFFIRMS the
Adversary Court's FOF/COL as to its ruling in favor of
Alvin Woods on Count IV.   This Court REMANDS this case to the
Adversary Court for the entry of the necessary orders consistent
with the rulings in this Order.

<u>CONCLUSION</u>

On the basis of the foregoing, the Adversary Court's
Findings of Fact and Conclusions of Law, issued on May 15, 2015,
and the Judgment, issued on June 4, 2015, in Adversary Proceeding
No. 14-90019, are HEREBY AFFIRMED IN PART AND REVERSED IN PART,
and the instant case is HEREBY REMANDED to the Adversary Court
for the entry of the necessary orders consistent with this Order.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, January 29, 2016.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge


**VICTORIA SEBETICH VS. ALVIN K. WOODS; CIVIL 15-00233 LEK-BMK;
ORDER AFFIRMING IN PART AND REVERSING AND REMANDING IN PART
BANKRUPTCY COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW AND
THE JUDGMENT**